Mr. Horowitz? Good morning, Your Honors. May it please the Court, Jeremy Horowitz with the EEOC. In this case, Ms. Witten was forced to undergo a medical exam in the absence of objective evidence that her congenital condition had worsened. And she was ultimately suspended and then terminated because McLeod thought that she might hurt herself when she was traveling off-site in pursuit of a story. But she had done her job for 28 years without ever once falling in pursuit of a story in the way that McLeod had feared. McLeod wanted to protect her, so it took away her job. And this is exactly the sort of paternalism that the ADA seeks to prevent. A jury could have easily found that McLeod violated the ADA in three separate ways in this case. First, in forcing Ms. Witten to undergo the two examinations. Second, in forcing her to undergo examinations that were not tied to her essential job functions. And third, uncritically relying on a facially unbelievable report and recommendation, even when those recommendations made no sense on their face. Well, I guess your argument is there's a question of fact for a jury to consider, because they could have found it wasn't an essential function, or it wasn't, that she had the disability or she doesn't. That's exactly right, Judge Floyd. In each of these cases, we're arguing that a jury could have found, we didn't seek summary judgment down below, but we think that summary judgment was inappropriately granted to McLeod, because there is a question for a jury in each of these cases. First, the jury could easily have found that the exam was unjustified. For an employer to have a justified requirement that an employee undergo a medical exam, the employer has the high burden of showing it has a reasonable belief based on objective evidence that the condition would impair the employee from performing the essential functions of the job position, or that the employee poses a direct threat. And here, a jury could have found that McLeod didn't find either. McLeod says it was concerned that Ms. Witten could not safely navigate story sites. But the Senate report that accompanied the ADA that was quoted at length in the Wright opinion that was cited in our brief, that says that the best indication of whether an employee is able to perform a job is the employee's experience performing the job. Here we have 28 years worth of data saying that she could. She never once fell in the way that McLeod asserts it was worried. So assuming you went on the first issue, as to the second issue, struck me that Judge Hendricks presumed that the exams were lawful, which is a question of fact in the first case. So should you prevail on the second issue because of that? I think we, each of these issues independently creates a violation of the ADA, but I think we should also prevail on the second issue based on the nature of the exam. I mean, I think the instruction for the court below would be useful to explain why it is that the exam was not tied to her essential job functions. In this case, as you, I mean, I'll talk about that briefly if I could. In this case, the examiner, or the Mr. Laliberte, he didn't take into account McLeod's assessment of the job, which said that it only required lifting up to 20 pounds, didn't take into account Ms. Witten's assessment of her job, and instead he decided that she needed to, by weighing her purse, which he, first he wasn't sure if he had weighed it or not, but later he testified that he had, and in fact her purse weighed 20 pounds. So that's sort of inherently unbelievable in space. I don't know, mine probably weighs 20 pounds. Oh. No, but let me ask you something, Mr. Horowitz. Yes. On the difference between your two claims, don't they really collapse? It seems to me that if you show that there was no valid basis for requiring her to take this exam relative to her job performance, then she was unlawfully terminated. That's correct, Your Honor. They do, I mean, they are related to each other. Each one can independently lead to a violation, but you're right. I mean, the claims did sort of go sequentially, and that's, under the facts of the case, really once the ball started rolling here, once she was forced to undergo the exam, that the exam was inappropriate given her job and given her history of job performance, and then the termination was inappropriate. You can't be fired based on an exam that shouldn't have been required in the first place. That's exactly right, Your Honor, yes. So just, if I could finish up with the exam, it wasn't tied to her specific job experiences, and he never asked what her experiences were. He assumed that she had recently begun to start falling, when in fact, she had been falling for the entirety of her career at McLeod. He never asked whether she agreed with his assessment of what her job required, and in fact, she said no. That was far more than she had ever had to lift on her own. Let's see, this is, I'm sorry here. So without taking that 28 years of experience into account, he's really not doing what the Senate said in its report back in 1989 he needed to have done. Turning to McLeod's reliance on the report here as a separate path to finding an ADA violation, both the justice case that we cited and the holiday case that we cited stand for the proposition that a medical opinion, when it's facially unreliable, when there's something about that opinion on its face that is not credible or maybe indicates a lack of objectivity, then even in the absence of a countervailing medical opinion, an employer still is not justified in relying on that, and that's exactly what happened here. The report was unreliable in several ways. First, in saying that she was restricted to a 10-mile radius, he didn't explain why going off-site within nine miles would have been safe for her, but 11 miles pushed the boundary too far, and then 20 miles and 50 miles would have been a bridge too far. Doesn't explain that, and it really sort of restrains credulity to believe that that would make any sense. In addition, he said that she was a high fall risk in 75% of her job. When asked where he got that 75% figure from during his deposition, he said, well, I've been told she's falling at home, falling at work, falling at lunch. One, two, three, 75%. It made no sense, and so McLeod cannot just say that they were relying on this inherently unbelievable assessment and avoid liability just because there was no countervailing assessment. In addition, that assessment of being a high fall risk, that contradicts what he had said five days earlier in an email immediately following the exam, that she was only a mild to moderate fall risk. So in each of these ways, McLeod should have seen this was not a reliable report. To what exam, to what extent, Mr. Horwitz, do we consider the fact that you have Ms. Swindler in there saying, well, she seemed to have a decreased enthusiasm for her job, but didn't really specify, and maybe some employees had seen her sleeping, but never verified that. How does that factor into the mix of a disputed issue of fact? Does that create a question of the employer's motive in terms of requiring this exam that they were trying to get rid of her? Is that a valid consideration that we put in the mix when we decide whether they're disputed issues of fact? So glad you brought that up, Judge Keenan. Here, you could find that that's a consideration that could be included in the mix, but you don't need to. The Sullivan case that we cite says that really the motivation doesn't matter. The key thing is that there is a reasonable basis based, a reasonable basis for an objective belief based on objective factors that there's a reason to think that the employee can't perform the essential job functions. It doesn't matter what the motivation is. And here, in addition, with respect to what Ms. Swindler said, she brought up this alleged problem with her performance. Well, first, that's a disputed issue of fact because her most recent performance review, which occurred eight months before she was suspended, said that, didn't bring up any of these alleged problems, but Ms. Swindler testified that this had, in fact, been going on for a year and a half. So a jury could hear that and find it questionable. But even if the jury found that there were these performance concerns, the ADA's clear that performance concerns should be dealt with as performance concerns. The employer should not assume that when an employee with a disability has these performance concerns that it must be related to the disability. Instead, they should deal with them as performance concerns. And, in fact, that's exactly what Ms. Carr, the Director of Human Resources, told Ms. Swindler in this case. Said, no, you should talk to her, and if it requires counseling, counsel her. But don't assume that it was related to her disability. And that's exactly what the ADA is for. It's to allow people with disabilities to perform their jobs without this stigma and without this assumption that if there are performance problems, it must necessarily relate to the disability. And our guidance, actually, is very instructive on that. It goes through how an employer should balance these competing concerns. And it's very clear that in a case like this, where she might have lost enthusiasm, she seems not to have that same fire, she doesn't have the same team spirit that she had before, that's not attributable to the disability. That should be dealt with as a performance issue. If there are no further questions, Your Honors, I'll reserve the rest of my time for rebuttal. All right, thank you. Thank you, Your Honors. Mr. Shetterly. May it please the Court. Mike Shetterly for McLeod Health. I do think that we are in alignment, that you can look at this case in three phases. One, whether McLeod had the right to test. Second, what is the standard for determining whether the scope was appropriate? And the third is, once you have the results of a medical exam, what does an employer do with it, and what is the standard for review of an employer's decision based upon a test? This all goes, the issue of whether an employer has the right to test goes to whether the test is job related and consistent with business necessity. The EEOC's regulations, their guidance, and the Fourth Circuit all articulate the same standard, which is, did McLeod have objective evidence that Ms. Witten may not still be able to perform all of the essential functions of her job, or do so safely? Where is the evidence in this record that the ability to go to other campuses was an essential aspect of her job? She elected to go to other campuses, but where's the evidence in the record that she had to do that as a condition of employment? Yes, ma'am. Your Honor, you can find it in two places. First, Witten admits it in her testimony. She said it was preferable to go. Well, she said that she was never specifically told to go. She believed that that was what she was supposed to do, to go to the other campuses. Her charge is to report the news of McLeod, to tell the story of McLeod. McLeod is five campuses spanning 100 miles in the Pee Dee area of South Carolina. And her boss, Jomana Swindler, said her job was not to tell the story of the Florence campus, her job was to tell the story of McLeod. Right, and she'd been doing this for how many years? I know she wasn't the editor for 28 years, but for many years she'd been doing this job successfully. Actually, Your Honor, the way it worked was she started in the PR department, working for McLeod News. That role moved to HR. She was still doing the same job. And then she came back to the PR department, reporting to Jomana Swindler, starting in about 2004. Okay, but the only time she'd, and this is what really concerns me about this case. Yes, ma'am. The only time that she fell at the workplace was when she tripped over a rug at the entryway, which anybody can do. And how does that form a basis, then, for requiring a person who had done their job for so long to undergo these medical exams? Yes, Your Honor, so a couple things. It wasn't just the fall at work that formed the basis. And it wasn't just a decrease in enthusiasm that formed the basis. What Jomana Swindler reported, and I think it's important to note that Jomana Swindler did not make the decision. Occupational Health made the decision based on the report of Jomana Swindler. And the case law in the Fourth Circuit says an employer does not look behind the report to determine motivation or its veracity. What she reported, not just a decrease in enthusiasm, but she reported that her ability to ambulate was worsening. In walks of a short distance, she was sweating profusely and was flushed and her face was almost poker. And does the record show that Ms. Swindler had any medical training? I don't believe it does, but that gets to the heart of the issue. Disputed facts, I mean, what basis did Ms. Swindler have for opining on this lady's allegedly increased disability? It was, I respectfully disagree with the word opinion, or opining, what she was doing is she was reporting facts to Occupational Health. The record shows that Occupational Health in consulting with the doctor at Occupational Health said this is enough to have me concerned that we need to do a medical exam. Excuse me, I didn't mean to cut over you there. So they ultimately send her to Lalibert, if that's how you pronounce it, and he comes up with the suggestion, well, as long as she stays within 10 miles of the campus, she should be okay. Well, where is the logic to that? If she is gonna be falling, if she's gonna be safe within 10 miles, why wouldn't she be safe going from her car to a building 50 miles away, or her car to a building 75 miles away? Where is the logic of that? It seems to me the evidence just doesn't wash logically. Well, so, and I'm glad you raised it. His testimony was it has to do with familiarity, and that is consistent with Ms. Whitten's testimony about what causes falls. The more familiar you are with the area, the less likely you are to fall statistically. I think what's missing here is the EEO's case fails to take into account the fact that McLeod grew rapidly. Actually, when she started the job, there were no other satellite campuses. All this growth happened while she was in the role, and she was the only person doing the McLeod news. Everybody else in the PR department is responsible for other aspects of PR, marketing and those types of things. She's the only one that's supposed to tell the story. What Laliberti's decision was is that it all has to do with familiarity. She is not familiar with those other campuses. She is not familiar with the outlying areas. No one there is familiar with her and understands her condition. If we keep her local where people know her and she knows the environment, she is safer. But she hadn't fallen on any campus. She took that one trip on the rug inside the building, but she didn't fall on any campus within 10 miles. Well, she fell at work. Right, she fell, she tripped over the rug entering the building, right? Yes, ma'am. Okay, but there's no evidence that she had tripped on another McLeod campus anywhere, right? No, Your Honor, not in any of the other campuses. That's correct. How far would 10 miles get her in terms of beyond Florence? It would just be Florence, Your Honor. Exactly, and that became the linchpin to why she wasn't qualified, because she couldn't get any place else. Well, it's not that she couldn't get another place. As Witten and McLeod, they're both in alignment on this issue. If she's just doing reporting and doing the harvesting of stories on the McLeod campus, there were devices that could be used that would allow her to ambulate. As I'm sure all of the panel is familiar with hospitals, they are huge. So it's not just about driving the car to a campus to tell a story. She doesn't harvest the story from her car. Once she gets there, she has to get out and ambulate to whatever the location is, and it's not just the hospitals, it's parks, it's softball fields, it's wherever the McLeod news is happening. That's where she has to go. The problem that everyone ran into in trying to figure out whether she could still do the job with accommodations was once she got to these other locations, what assistive device would she have with her that would allow her to ambulate? And what she was saying in her conversations with McLeod, she says it and McLeod says it, that they were talking about it. The only difference in the record is, Ms. Witten says, I never specifically came out and asked for it, we just had discussions about, well, if I had a scooter or something like that, I could get around the Florence campus, but what happens when I go out? I'm gonna need a van. I'm gonna need somebody to help me get it off the van and lift it and then get where she's trying to go. That's where McLeod ran into a roadblock about whether she could still do the functions of her job with an accommodation. Okay, but she was directed, Ms. Witten was directed to file a request for accommodation. She didn't think she needed one, right? And Williams Blake said, you need to after the FCE. She said, we want you to file a request for accommodation, didn't she? That wasn't Ms. Witten's idea. Ms. Witten testified that she was instructed to do it, that she felt like she was the head of occupational health, but in her testimony in the actual, the deposition, she admitted that she would need some accommodation in order to do the job. She admitted it. So whether she wanted to fill out a piece of paper or not is irrelevant to her, when compared to her admission that she conceded she could not do this job without a risk of falling. Well, she'd been doing it for 28 years. So isn't this kind of for a jury? That's what I'm worried about. Why isn't this for a jury to sit and weigh and think, well, when she made that statement, the employer had already said, file a request for whatever you need. And she'd been doing her job pretty well for 28 years, fell once recently on the job. Why can't a jury weigh that, as opposed to the court taking it upon itself to throw the case out? Well, so a couple things, if I could get this thought out, and I'm happy to answer any questions, and I'm gonna answer your question right now, but I think there's two things I would like for the court to keep in mind. First, there is no evidence she was doing this job as it grew for 28 years. As I said, there were no other satellite campuses when she started. McLeod was very small compared to what it is when she was out of work. And the second thing that I think is important, and I think this goes to the crux of why the EEOC felt passionate about this case, but why their logic fails. The whole premise behind the EEOC's claim is that she's had the same congenital defects for her entire life. And so if she could do it at the age of 40, that means that she could do it when she's 60, 20 years later. That belies common sense. Maybe yes, maybe no. Well, maybe she's just as agile at 60. Many people are. Maybe, but here's the point of the ADA. If an employer has an objective basis to believe that conditions have changed, that she's maybe not able to still do the job, it has a right to conduct a medical exam. Okay, so the objective basis in this case, other than Ms. Swindler's observations, are what? That she fell once. Well, she actually fell three times. She fell once at work. Once on McLeod's premises. Once at work, once in a park. She could easily have to do a report from a park. And once was on her lunch break. She was a salaried employee. I'm not sure the record is very clear on whether she was on the clock or off the clock, but I do admit that she was on her lunch break in the middle of the day when she fell at a restaurant. But when you fall in a park and you don't miss any work, and when you trip and fall in a rug on the employer's premises and you don't miss any work, and when you fall at a restaurant and then you go for an x-ray, but you go back to work the next day, how is that evidence that she can't perform her job anymore? I mean, she wasn't calling in sick. She wasn't saying, I can't work as a result of these falls. In order to do the exam, we either have to show that we had objective evidence that she may not be able to perform her job anymore or do so safely. And I think that's the second issue that we have here is there seems to be from the EEOC's position that falls are no big deal. Falls are a huge deal. We've all been watching the news with one of our justices who fell. The older we get, the more dangerous falls become. Actually, the CDC issued a report in 2016 that said the number one fall risk for persons over 65 or the number one risk for persons over 65 is falling. It's falling. When you couple death and serious injury, fall is the most serious threat to the agent. So the whole point of this is the fact that she could do it and it wasn't the same job, but the fact that she could do it at 40 does not mean she can do it at 60. And Laliberte's point is also missed here is he doesn't say that the fall risk and the threat of serious injury is solely because of her congenital defects. It was because of a severely deconditioned state. But in the end, if the court finds that there was objective evidence of whether or not she could still perform the essential functions or do so safely, it has a right to conduct the medical exam. Once it conducts a medical exam and it receives an opinion that she cannot perform the essential functions of the job, when you look at the direct threat standard under the regs and in the guidance, what it says is that an employer has to reasonably rely on the medical evidence. At the point the exam was actually issued and an opinion was rendered, McLeod is supposed to follow the medical exam and the opinion that's in it. And honestly, if there is an issue that I think the court should consider, it is the fact that it is the only medical opinion of her abilities or inabilities in the record. Mr. Shetland, you talk about 28 years. Isn't it true in this case, if someone were to assess risk of falling, the first day she came through the door, she would have been a prime subject of risk of falling, correct? I don't think that that's correct. I can't concede that. You can't concede that? The lady said, I think one of the more eloquent statements I've ever heard in the record. She said, falling has always been a part of my life, all of my life, and there's no way to get around it. But for 28 years, in spite of her disability, she came to work. She did that. And now you're taking what she had, which is a risk of falling, 28 years later and said, that's the reason why we're now gonna examine you, decide whether or not you're performing your job. This is not a case where somebody's just growing old, growing old, well, you're 65 years old, I guess we gotta examine you because you know you're gonna be falling next year. It was, that's what you said. You said it's a function of age. This is not that case. It's, your honor, I appreciate the comment, but I don't need to appreciate the comment, just answer the question. Isn't it true that on day one, she would have been a risk of falling? Well, she may have been a risk of falling. The question is whether that risk was a high risk of falling with a high degree of injury. Well, there's evidence that there's been some progression as to her congenital problem has somehow deteriorated. Where's the medical evidence in this record? That's what I'm saying. In your view, what's the medical record? The medical record says that her risk of falling and the risk of injury has increased because of her severely deconditioned state. What does deconditioned mean? Meaning she is completely out of shape, is weak and cannot handle the weight load that she's carrying. Well, what about the 50 pounds? Where did that come from? She never had to lift 50 pounds, not day one of 28 days and you make that the metric for whether or not she's qualified. That in itself is somewhat questionable at best. Well, Todd Laliberte said that he went through a progression of reviewing the job description, discussing the job with Jimena Swindler, the manager, went to the job site that she normally would type her reports and things like that, and looked around and measured everything. And then interviewed Whitten herself. He says that the weight load that he determined was based on what Whitten said that she did on a regular basis. Whitten gave him the, she told him the equipment she had to carry. He says he measured that, including her purse, and that's where he got the weight load. I actually think that this employer did more than most employers do when they do a medical exam. And this medical exam was more careful to try and get it as close as possible to the functions that Whitten did. I mean, the testimony is as follows. Laliberte says quite clearly he interviewed Whitten, found out what she did, found out what she carried, and performed the test based on what she said. She says she doesn't remember. That doesn't create a question of fact. But she was an editor, correct? No, she was a reporter. She didn't edit? She also edited because she was the only member. She was an editor, correct? I consider her a reporter. Was she an editor? She edited her own stories and then did the layout. All right, she edits. She edited, she read, she listened, she talked to people, correct? She did. Where's the lifting? Pencil? No, she says that she has to bring her camera. She brings the equipment that she's gonna use to do her stories. There are events that she would attend. I mean, as Laliberte described it, she's putting papers up, she's stocking things, she's getting stuff unstocked. But I think that that's what she wanted to do. She wanted to move from being a reporter to just an editor. And in order to tell the story, you have to go where the story is. That's the essence of why. I thought the record said there was a team. You had reporters at other campuses as well. There is, no. That's not the record? The record is that there are other members of the PR department and they would give her ideas of stories, but she was the one who needed to go interview the people and get the story and write it based on the interviews. And what the testimony is from Swindler is that one of the big issues and the changes that happened in the last year was the fact that she stopped going and doing that. She started to try and get other people to do her work for her and write the stories and interview people and just send it to her. And the other coworkers were complaining because that was not their job. That's what the record says. If there are no further questions, I'll. No, there are none. Thank you. Thank you. Mr. Horowitz, you have a few minutes. Thank you, Your Honor. I just wanted to respond to a few of the points that my colleague made. First, with respect to the question about the essential aspect of the job, that going off-site and conducting these interviews was. It wasn't in the job description and this court's cases in Rea Zudin and Jacobs both say that that's evidence that it wasn't actually an essential function. And second, there's a difference between an essential function and a preference for how that essential function is accomplished. And the Skirsky case from the Third Circuit that we refer to in our brief distinguishes between what the essential function is and a preferred method of accomplishing that essential function. Both Swindler and Witten testified for a preference for in-person interviews, but neither one said it was an essential function. Second, responding to the point that when Ms. Swindler reported to Occupational Health and they believed her report, that that sort of immunized what they did subsequently. As I believe Your Honors pointed out, she had no medical background and she testified that part of her impression was based on her own family history of neurological difficulties. So that isn't objective evidence as to Ms. Witten's condition. That's her own sort of subjective gloss on what she's seen. Third, with respect to the reasonableness of the 10-mile radius, this is actually the first I'd heard that explanation of this sort of the familiarity in the expanding campus. But whether or not that's a justifiable explanation, it's a question of fact that should go to the jury, which is really, which sort of underlies everything that we've been arguing. My colleague said that Ms. Witten said that she needed an accommodation and referred to the possibility of a van or a shadow to help her. In fact, in her testimony, she specifically said she never made that request and she's repeatedly said she doesn't need an accommodation to do her job. Let's see, with respect to her ability to do the job as McLeod grew, again, that's an issue of fact. There is no, as Your Honor pointed out, she's fallen once, even with this expanding campus, or expanding group of campuses. She only fell once and that was, that's not an indication that she can't handle the job. As I believe Judge Gregory, as you mentioned, it's not that she's getting old. There was no evidence in the record that her condition had changed. No objective evidence. Let's see. With respect to this idea about her deconditioned state, the medical records in the record show that her weight, her blood pressure, and her pulse had remained constant over the last 20 years. So there was nothing new about this deconditioned state that Lalibert was relying on. Whether or not that actually is relevant, again, that's an issue of fact. And finally, with respect to this idea of the, we're a team, a communications team, there is evidence in the record that some of these campuses had PR people locally and they would write up stories and take pictures and send them for inclusion in the newsletter. That's what she testified to. So that's not saying that she can't do her job. That's just saying that this was one of the aspects of having the people working together as a team. If there are no further questions, Your Honor, thank you very much. Thank you so much. All right, we will reach over and greet counsel and then proceed to our final case.
judges: Roger L. Gregory, Barbara Milano Keenan, Henry F. Floyd